UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 19-cr-043-01-01 |
| VERSUS | CHIEF JUDGE HICKS |
| CHRISTOPHER DONTA WILLIS (01) | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Defendant, who is self-represented, is charged with a drug conspiracy, two counts of possession with intent to distribute methamphetamine, felon in possession of a firearm, and possession of a firearm in furtherance of a drug-trafficking crime.  The charges arise out of a traffic stop.  As a result of the stop, Louisiana state troopers discovered methamphetamine in Defendant's jacket pocket and in his vehicle.  Defendant's home was then searched, and the troopers discovered additional drugs and a firearm.

Four prior motions to suppress were filed, two of which were filed while Defendant was represented by counsel (Docs. 35, 53, 66 & 148).  Since electing to represent himself in this case, Defendant filed a litany of pro se motions.  In March 202, the court issued a minute entry stating that "[n]o additional motions regarding the searches or search warrant may be filed.  The Fourth Amendment issues have been fully litigated, and Defendant will not be permitted to re-hash those issues."  Doc. 159.  Defendant has also been cautioned "not to file frivolous motions for the sole purpose of delaying trial."

Despite these warnings, Defendant has filed a fifth Motion to Suppress (Doc. 178), which is now before the court. Defendant challenges the pat-down search that occurred after the traffic stop and states that it was not based on reasonable suspicion. For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

    **A. The Search Warrant[1]**

Following the traffic stop, Rickey Anderson, an agent in the DEA Task Force, applied for a warrant to search an apartment out of which Defendant was suspected of selling drugs. The affidavit in support of the warrant was filed with the court under seal and states that on January 24, 2019, a cooperating source ("CS") advised the Defendant was attempting to give the CS approximately 10 ounces of methamphetamine later that evening. Agents with the task force began surveillance of the residence but were not able to locate Defendant. They terminated the surveillance a short time later. Doc. 156, p. 1.

    The next day, the CS advised TFO Anderson that Defendant and Walker were at the CS's residence and the CS thought Defendant was attempting to distribute methamphetamine. When the task force agents arrived at the CS's residence, Defendant and Walker were no longer there. The CS told TFO Anderson that Defendant and Walker would return in approximately one hour. Later that morning, TFO Hank Haynes observed a 2013 gray colored Chrysler 300 arrive and park in the parking lot of the CS's apartment. The CS called TFO Anderson and advised that Defendant and Walker were inside his

---

[1] The affidavit in support of the search warrant was filed under seal at Doc. 156.

apartment. A short time later, the CS advised that Defendant and Walker were leaving the residence, which was verified by the surveillance agents. The agents observed Defendant and Willis get into the Chrysler and drive away. Agents then asked for the assistance of Trooper Matt Titus to conduct a traffic stop of the vehicle if a violation was observed.

### B. The Suppression Hearing[2]

The following facts were established at a hearing on Defendant's Second Motion to Suppress. Agents with the DEA Task Force contacted Matthew Titus, a trooper with the Louisiana State Police. The agents told Trooper Titus that someone in a gray Chrysler 300 was suspected of transporting and selling narcotics, and the Chrysler was leaving a location off of Benton Road. Doc. 75, Tr. p. 17-19. Trooper Titus saw the suspect car traveling south on Airline Drive. The posted speed limit in the area was 35 miles per hour, and traffic was "pretty thick." Tr. 5-6.

The Chrysler was driving approximately 35 miles per hour and was less than a car length away from the pickup truck in front of it. Trooper Titus testified that, based on his training and experience, the car should have been at least two-and-a-half to three car lengths behind the truck. At that time, the two vehicles were traveling toward a light that had turned yellow. The pickup truck went through the intersection, and the Chrysler stopped at the light. Trooper Titus testified that, if the driver of the pickup truck had hit his brakes forcibly to stop at the light, the Chrysler could have rear-ended him. Tr. 7-8.

---

[2] These facts were recited in the Report and Recommendation issued on the Second Motion to Suppress. (Doc. 78, adopted by Chief Judge Hicks at Doc. 97). Because all of the relevant facts were established at a prior hearing, the court finds that no hearing is necessary to decide the current motion.

Trooper Titus initiated his lights to stop the Chrysler for following too closely. Tr. 8. When he activated his lights, his dash camera began recording; however, the camera did not record the initial traffic violation.[3] Tr. 10.

Trooper Titus made contact with Defendant, who was driving the Chrysler, and Jamal Walker, who was in the passenger seat. When Trooper Titus asked for Defendant's driver's license, he noticed that Defendant's hands were trembling and that defendant was constantly breaking eye contact. Tr. 11. Trooper Titus noticed that Walker's hands were also shaking. Tr. 12.

Trooper Titus conducted a pat-down of Defendant for officer safety. During the pat-down, he felt "a round-type bag that felt like narcotics" in Defendant's sweatshirt pocket. Defendant and Walker then fled on foot. Tr. 12-13. As Walker fled, he dropped his jacket. Defendant and Walker were both eventually captured and arrested. Tr. 15. Narcotics detectives located approximately 116.4 grams of suspected methamphetamine inside Defendant's sweatshirt pocket. They also found approximately 35.9 grams of suspected methamphetamine in Walker's pants pocket. Tr. 15.

Trooper Titus put Walker's jacket back inside the Chrysler. He then deployed his K-9 on the vehicle. The dog alerted on the car, and Trooper Titus searched the vehicle. He found approximately 62.8 grams of suspected methamphetamine in Walker's jacket pocket. Tr. 15-16.

---

[3] The recordings from the trooper's dash camera and body camera were admitted into evidence as Govt. Ex. 1.

**The Motion to Suppress**

Defendant does not challenge the legality of the traffic stop in the current motion. Instead, Defendant argues that Trooper Titus did not have reasonable suspicion to conduct the pat down because the information Trooper Titus received regarding possible narcotics trafficking came from an unreliable confidential source.

Defendant argues that the agents "did not determine any basis for the (CS) information or offer no independent corroboration of the tips made by the (CS) before issuance of the alert to Trooper Titus." Defendant argues that the agents' reliance on the CS was unreasonable because the CS "clearly lacked the veracity and reliability after 2 failed surveillance attempts that did not yield or support a basis of knowledge of the information given to the Alerting Officer." Defendant also alleges that the CS "had engaged in (3) drug transactions on or about January 24, 2019 in violation of the Confidential Source Agreement."

**Law and Analysis**

To justify a pat-down of the driver during a traffic stop, the police "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 129 S.Ct. 781, 784 (2009). The officer "need not be certain that an individual is armed" to perform the search. United States v. Tuggle, 284 Fed. Appx. 218, 223 (5th Cir. 2008). Instead, "the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." Id.

The Government argues that Trooper Titus reasonably believed that his safety was in danger because of the nervousness of Defendant and Walker, and because he was the

only officer present at the time of the stop. The Government also argues that, under the "collective knowledge" doctrine, Trooper Titus could rely on the information from DEA agents that Defendant and Walker were possibly involved in narcotics trafficking. Under the collective knowledge doctrine, an officer initiating a stop or conducting a search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion, so long as he is acting at the request of those who have the necessary information. U.S. v. McPherson, 630 Fed. Appx. 330, 331 (5th Cir. 2016), citing United States v. Ibarra–Sanchez, 199 F.3d 753, 759 (5th Cir. 1999). The collective knowledge theory applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts. United States v. Ibarra, 493 F.3d 526, 530 (5th Cir.2007).

Reasonable suspicion does not have to be based on a personal observation. It can be based on information provided by a confidential informant, if the information possesses "an indicia of reliability." U.S. v. Roch, 5 F.3d 894 (5th Cir. 1993); citing Adams v. Williams, 92 S.Ct. 1921 (1972). In examining the totality of the circumstances, the "informant's veracity, reliability, and basis of knowledge ... [are] important factors; however, 'a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or some other indicia of reliability.'" United States v. Jackson, 818 F.2d 345, 348 (5th Cir. 1987) (quoting Illinois v. Gates, 103 S.Ct. 2317, 2329, (1983)).

The court finds that, under the totality of the circumstances, the information from the CS exhibited sufficient indicia of reliability. The CS gave reliable information leading

up to the traffic stop.  On January 25, 2019, the CS told TFO Anderson that Defendant and Willis were at his house.  By the time the agents arrived to conduct surveillance, Defendant and Walker had left the residence.  The CS told the agents that Defendant and Walker would be back in approximately one hour.  A short time later, Defendant and Walker did return to the residence.  The CS then called TFO Anderson and told him that Defendant and Walker and returned and would be leaving shortly, and the agents watched Defendant and Walker leave the apartment.  All of this information also proved to be correct.  See Alabama v. White, 110 S.Ct. 2412, 2417 (1990) (a tipster's ability to predict a suspect's *future behavior* is particularly relevant because it "demonstrate[s] inside information—a special familiarity with" the suspect's affairs.).

Defendant attempts to frame the January 24, 2019 surveillance as a "failed attempt" to undermine the CS's credibility, but reasonable suspicion does not require that every detail provided by an informant be verified.  Id. at 2416.  Accordingly, the court finds that the DEA agents were not unreasonable in relying on the information from the CS.  Because this information was communicated to Trooper Titus, he could rely on it under the collective knowledge theory.

The court further finds that, under the circumstances, Trooper Titus had reasonable suspicion to conduct the pat down search of Defendant.  Trooper Titus noted at the suppression hearing that when Defendant handed him his driver's license, Defendant's "hands were trembling" and "he was constantly breaking eye contact with me."  Tr. p. 12.  Trooper Titus also testified that Walker's "hands were shaking pretty badly, too."  Tr. p. 13.  Furthermore, the dashcam video confirms that Trooper Titus was the only officer

present at the time of the pat down.  Gov. Exh. 1 at 6:22-6:49.  All of these circumstances, taken together, reasonably led Trooper Titus to believe that his safety was in danger.  Thus, the pat down search was supported by reasonable suspicion.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 178) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections.  Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of September.

Mark L. Hornsby
U.S. Magistrate Judge